# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| WILLIE C. DOWNEY ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 09 C 5870 |
| ) | |
| R.W. BRISCOE & ASSOC. INC. d/b/a ) | |
| ENFORCEMENT SECURITY AGENCY, and ) | |
| YRC, INC., f/k/a ROADWAY EXPRESS, INC., ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Willie C. Downey has sued his former employer, R.W. Briscoe & Associates, Inc. d/b/a Enforcement Security Agency (ESA), and the business at whose facility he worked, YRC, Inc. (YRC). Downey asserts three claims of race discrimination pursuant to 42 U.S.C. § 1981. Only one of those claims involves YRC—Downey's claim that YRC maintained a racially hostile work environment. YRC has moved for summary judgment on that claim and has asked the Court to strike certain parts of Downey's affidavit and his statement of additional facts submitted pursuant to Local Rule 56.1.

YRC moved for summary judgment on three separate grounds. After discussions with the parties on March 13, 2012, the Court deferred YRC's motion except for one issue—whether YRC may be considered to have been Downey's *de facto* employer such that it may be subject to liability on his race discrimination claim. For the reasons stated below, the Court denies YRC's motion for summary judgment in that regarding and denies as moot YRC's request to strike.

**Background**

YRC operates a trucking and freight terminal at 2000 Lincoln Highway in Chicago Heights, Illinois (the Chicago Heights Terminal). The terminal was formerly operated by Roadway Express, Inc. (Roadway), but in approximately 2008–2009, Roadway merged with another transportation company to create YRC.

Downey, who is African–American, began working as a security guard at the Chicago Heights Terminal in 1998. In his complaint, Downey alleges that YRC was responsible for maintaining a racially hostile work environment during his ten-year tenure at the Chicago Heights Terminal. Am. Compl. ¶ 41. Specifically, Downey alleges that YRC failed to take action against: (1) frequent displays of nooses and other racially hostile symbols around the Chicago Heights Terminal, (2) racially hostile graffiti posted in the facility's bathrooms, and (3) YRC employees' frequent use of racial slurs against Downey.

Downey began working at the Chicago Heights Terminal after he was hired by Hunt & Hunt Investigations, a private security company that had a contract with YRC to provide security at the facility. Downey was given an identification badge with his name and "ROADWAY Express SECURITY OFFICER" written across the top. Pl. Ex. 2. Hunt & Hunt required Downey to purchase his own uniform, but it reimbursed him for the costs. Hunt & Hunt did not reimburse Downey for the cost of the gun he was required to carry while on duty. During his deposition, Downey testified that he received a Roadway book of rules that dictated what the guards were required to do and "how [they] needed to do it." Pl. Ex. 5 at 48–49. YRC denies that Downey was ever given a Roadway rulebook.

As a security guard, Downey was required to screen incoming and outgoing employees to protect against theft, inspect trucks before allowing them to leave the facility, record each truck's and employee's identification details into a shift log, and patrol the entire premises, including the loading docks, bathrooms, buildings, and fence line. At the facility, Downey had three direct supervisors from Hunt & Hunt who scheduled the shifts on which each guard was assigned to work. Downey attended an annual performance review conducted by those three supervisors. The parties dispute whether a YRC representative was also present during the reviews.

The parties disagree regarding whether Downey was ever paid directly by Roadway, the entity operating the Chicago Heights Terminal at the time. In his deposition, Downey testified that from 1998 to sometime in 2005, he received a check in the mail every week from Roadway Express. Pl. Ex. 5 at 32–33. YRC denies that Downey ever received paychecks from Roadway. Both parties agree that in 2003, Roadway sent Downey a 1099-MISC form stating that he received "nonemployee" compensation from Roadway. Pl. Ex. 3. It is undisputed that by the end of 2005, Downey was receiving his paychecks through the mail from Hunt & Hunt. Def. Ex. 3 ¶ 9; Pl. Ex. 5 at 35–36.

On June 7, 2006, Ronin Risk took over security at the Chicago Heights Terminal. Ralph Briscoe, the company's owner, hired Downey to remain as a security guard at the Terminal. During his deposition, Downey testified that Briscoe hired him as a supervisor to ensure that the transition and training of new employees would go smoothly. Def. Ex. 1 at 52. Downey was demoted to his previous position as security guard during the first

3

year he worked for Ronin Risk, but he was again promoted to supervisor approximately one year later. *Id.* at 176–77.

Downey had one direct supervisor, also an employee of Ronin Risk, who took over the duties of scheduling shifts. The company gave Downey a new uniform, but his identification badge remained the same. Downey began receiving paychecks from Ronin Risk. It is undisputed that after Ronin Risk began providing security to the Chicago Heights Terminal, guards working during Downey's shift no longer patrolled the facility grounds and instead worked exclusively at the exit gates. The parties disagree, however, regarding whether YRC or Ronin Risk made this decision.

Sometime in 2007, Briscoe notified the security guards at the Chicago Heights Terminal that another one of his companies, ESA, would be taking over as the new security provider to the facility. Only two changes occurred as a result of ESA taking over the security at the facility: the "Ronin Risk" patch on Downey's hat was removed, and Downey began receiving paychecks from ESA rather than Ronin Risk.

Downey testified that from time to time, the security guards received orders about how to perform their duties, as well as discrete tasks that they were required to do that day. Pl. Ex. 5 at 82–89. Downey stated that those orders came from YRC personnel, typically in the form of written and signed memoranda that were posted on the guard shack. *Id.* at 89–92. YRC contends that none of its employees ever gave orders to any of the security guards at the Chicago Heights Terminal and that the security companies were solely responsible for the guards' work assignments. Def. Ex. 2 ¶ 5.

The parties agree that during the ten years Downey worked at the Chicago Heights Terminal, he did not work as a security guard at any other facility. Downey

concedes that when Hunt & Hunt's contract expired, Mr. Hunt offered to keep Downey and assign him to a different facility, but Downey elected to stay at the Chicago Heights Terminal as a supervisor with Ronin Risk and subsequently with ESA. Downey continued to work at the Chicago Heights Terminal until he was terminated by ESA on June 15, 2008.

## Discussion

Summary judgment is proper "if the movant shows that there is no genuine issue as to any material fact and [that] the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). In deciding on a motion for summary judgment, the Court "view[s] the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Trinity Homes LLC v. Ohio Cas. Ins. Co.*, 629 F.3d 653, 656 (7th Cir. 2010). Summary judgment must be granted "[i]f no reasonable jury could find for the party opposing the motion." *Hedberg v. Ind. Bell Tel. Co.*, 47 F.3d 928, 931 (7th Cir. 1995).

YRC has moved for summary judgment on three grounds: (1) it was not Downey's employer and thus cannot be held liable to Downey; (2) because the harassment Downey alleges was perpetrated by his co-workers rather than YRC supervisors, there is no basis for employer liability; and (3) Downey has failed to produce any evidence that he was subjected to severe and pervasive conduct that created a hostile work environment. As indicated earlier, the Court has stayed consideration of the second and third of these issues and today addresses only YRC's role as Downey's alleged indirect or *de facto* employer.

5

Under section 1981, "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to the full and equal benefit of all laws . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). Discrimination claims brought under section 1981 are analyzed in the same manner as claims brought pursuant to Title VII of the Civil Rights Act of 1964. *Eiland v. Trinity Hosp.*, 150 F.3d 747, 750 (7th Cir. 1998); *see also Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 403 (7th Cir. 2007).

Downey contends that YRC was his indirect or *de facto* employer and thus can be held liable for the racially hostile work environment he claims he experienced at the Chicago Heights Terminal. To assess this issue, the Court applies "a common-law test that involves general principles of agency." *Hojnacki v. Klein-Acosta*, 285 F.3d 544, 549 (7th Cir. 2002) (internal quotation marks omitted). This test requires a court to consider five factors:

> (1) the extent of the employer's control and supervision over the worker, (2) the kind of occupation and nature of skill required, (3) which party has responsibility for the costs of operation, such as the provision of equipment and supplies and the maintenance of the workplace, (4) the source of payment and benefits and (5) the duration of the job.

*Id.* at 549–50. The most significant factor is the extent of control and supervision over the worker. *Id.* at 550; *see also NLRB v. W. Temp. Servs., Inc.*, 821 F.2d 1258, 1266 (7th Cir. 1987) ("[J]oint employer status exists if two employers exert significant control over the same employees.") (internal quotation marks omitted).

**A.    Control and supervision**

"[I]f an employer has the right to control and direct the work of an individual, not only as to the result to be achieved, but also as to the details by which that result is achieved, an employer/employee relationship is likely to exist." *Alexander v. Rush N.*

6

*Shore Med. Ctr.,* 101 F.3d 487, 493 (7th Cir. 1996) (internal quotation marks omitted). There is sufficient evidence to allow a reasonable jury to find that YRC effectively controlled Downey's work as a security guard. Downey testified that when he began working at the Chicago Heights Terminal, he was given a copy of Roadway's employee handbook. Pl. Ex. 5 at 47–49. He also contends that he received weekly checks in the mail from Roadway directly. This changed at some point in 2005, but there is no evidence to suggest that Downey's job changed in any way at the time his checks began coming from Hunt & Hunt instead of Roadway. *Id.* at 35–36.

Although Downey's direct supervisors were employed by the three security companies, he testified that YRC's security investigator, Brian Simikowski, also supervised him and sat in on his performance reviews that were conducted at the Terminal. Downey also testified that he saw memoranda signed by Simikowski posted on the guard shack, instructing the security guards about new directives they were required to follow. *Id.* at 43–47. According to Downey, *all* of the day-to-day instructions to the guards came from YRC, through memoranda signed by YRC staff that were posted on the guard shack. *Id.* at 89–93. Downey also submitted deposition testimony from YRC corporate security manager Jeff Luzbetak to the effect that many of the requirements of and restrictions on Downey's job were dictated by YRC and were relayed to the individual guards by the security companies. Pl. Ex. 4 at 48, 51–55.

YRC argues that it did not exercise any control over the security guards but merely informed them of union rules that prohibited YRC from instituting any security measure that required physical searches of YRC union employees. A reasonable jury

7

could conclude, however, that YRC did, in effect, control Downey's position as security guard at the facility.

YRC contends that it was not Downey's *de facto* employer because it had no control over the hiring or firing of the security guards. YRC relies on the Seventh Circuit's statement in *EEOC v. State of Illinois*, 69 F.3d 167 (7th Cir. 1995), to suggest that the power to hire and fire an individual is the "key" power in the employment relationship. *See id.* at 171. The court in that case, however, was dealing with a claim involving "discrimination in hiring and firing." *Id.* The Seventh Circuit has since strongly suggested that the "key" powers at issue depend upon the alleged adverse employment action. *See Tamayo v. Blagojevich*, 526 F.3d 1074, 1088–89 (7th Cir. 2008) (distinguishing a prior case finding insufficient control based on the difference in the alleged adverse employment action at issue); *Hall v. Walsh Constr. Co.*, No. 11 C 8706, 2012 WL 3264921, at *3 (N.D. Ill. Aug. 9, 2012) ("A company can be considered a *de facto* or indirect employer if it directed the discriminatory act, practice, or policy of which the employee is complaining.") (internal quotation marks omitted).

Downey's claim in this case involves a racially hostile work environment. The claim largely involves racially offensive items that were displayed or depicted at YRC's Chicago Heights Terminal and racial slurs by YRC employees. In addition, Downey testified that YRC personnel gave him day-to-day instructions on his duties and how to perform them. A reasonable jury could determine that YRC exercised discretion and control over Downey's work, not to mention over the work environment itself.

### B. Occupation and skill

In addressing the second factor, courts consider the nature of the position and the skill level necessary to execute the duties required. *Worth v. Tyer*, 276 F.3d 949, 263 (7th Cir. 2001). A position that requires substantial training and supervision is suggestive of an employee–employer relationship. *Id.* Positions requiring special skills and independent judgment, on the other hand, suggest that the individual is an independent contractor. *Yonan v. U.S. Soccer Fed'n*, 833 F. Supp. 2d 882, 890 (N.D. Ill. 2011) (citing *Alexander*, 101 F.3d at 493).

This second factor does not carry much weight in this case. Downey's position as an armed security guard required him to obtain training and licensing before he began working at the Chicago Heights Terminal. This licensing was required of all armed security guards, and Downey had to renew his license yearly at his own expense. Downey also presented evidence, however, that he had virtually no discretion over how his job was performed and that YRC allowed him only to "observe and report." Pl. Ex. 4 at 54–55. Downey testified that he was given a Roadway rulebook, which told him what his duties were and what he was and was not allowed to do to carry out those duties. Pl. Ex. 5 at 48–49. This factor thus does not point very strongly in a particular direction.

### C. Responsibility for costs of operation

Under the third factor, "[i]f an entity bears costs of operation—such as for equipment or office space—an employee/employer relationship is more likely." *Worth*, 276 F.3d at 264. It is undisputed that Downey's "office" was located at Chicago Heights Terminal: he was stationed at the guard shacks at the terminal for every shift he

worked, he had access to all of the same facilities as YRC employees while on duty, and his job evaluations were conducted at the Terminal. Pl. Ex. 5 at 46–47, 74, 77. Moreover, Downey testified that YRC provided the forms on which he was required to report what he had observed. *Id.* at 63–64 (stating that the reports they filled out were labeled "Roadway Express" at the top of the form).

The security companies provided Downey with his uniform, and Downey himself was required to provide his own gun and pay his own licensing fees. A reasonable jury could find, however, that YRC predominantly provided and maintained the "space, equipment, furniture, fixtures[,] and other items required" for Downey to perform his job as a security officer. *Jensen v. Ill. Dept. of Corr.*, No. 97 C 50198, 1999 WL 218561, at *3 (N.D. Ill. Apr. 6, 1999).

**D.    Method and form of payment and benefits**

Downey contends that for the first seven years he worked at the Terminal, he was paid by a check mailed directly to him by YRC. Pl. Ex. 5 at 32–35. It is undisputed, however, that sometime in 2005, Downey began receiving paychecks from Hunt & Hunt instead of YRC, and that when Ronin Risk, and later ESA, took over security at the Terminal, Downey received paychecks from those companies directly. Once the security companies took over responsibility for Downey's paycheck, they likewise took over responsibility for withholding payroll taxes from that paycheck. The fourth factor thus favors a finding that Downey was not a YRC employee, at least from 2005 onward.

**E.    Length of job commitment and expectations**

The final factor concerns the duration of the position. "An employment relationship is more likely to be found when the parties have an expectation that their

relationship will continue." *Kerr v. EGN Cont'l Broad. Co.*, No. 01 C 7196, 2002 WL 1477629, at *6 (N.D. Ill. July 9, 2002) (citing *Hojnacki*, 295 F.3d at 550). In the present case, Downey testified that he worked at the Chicago Heights Terminal for approximately ten years. During that time, he held no other jobs and he did not work at any other facilities as a security guard.

YRC contends that because it did not attempt to influence Ronin Risk's decision whether to keep any of the Hunt & Hunt guards at the Chicago Heights Terminal, and because Downey could have asked for a transfer to another facility, he had no expectation of a continuing relationship. Downey testified, however, that when he was hired, he understood his employment with Hunt & Hunt to be specifically for work at the Chicago Heights Terminal. Pl. Ex. 5 at 38. This understanding is supported by the fact that throughout the ten years that Downey worked at the facility, his identification badge labeled him as a Roadway Express Security Officer. Downey's badge said this no matter which security company was in charge. Downey also produced evidence indicating that the only change in his job duties through his ten years at Chicago Heights Terminal came at the request of the YRC Safety Department, which asked that the security guards stop conducting car and foot patrols for liability reasons. Pl. Ex. 4 at 63–64.

Downey testified that he knew of one security guard who successfully requested a transfer out of the Chicago Heights Terminal. Yet according to Downey, that security guard was merely transferred to another facility that was also owned and operated by YRC. Pl. Ex. 5 at 66–67; *see also* Pl. Ex. 4 at 45. This fact arguably further supports a finding that YRC was Downey's indirect employer, as the only other facilities where

11

Downey knew he could work were also owned and operated by YRC.  Downey's longstanding tenure at the Chicago Heights Terminal, as well as the continuity of his job duties at the YRC facility over the span of three separate contracts, provide evidence from which a reasonable jury could find that YRC was Downey's indirect employer.

**F.    Summary**

There are numerous disputed facts that are material to a determination of whether YRC may be considered to have been Downey's employer.  These factual disputes, particularly those relevant to the level of control that YRC exercised over Downey, are the kind of disputes that "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A reasonable jury could find under the five-factor test enunciated by the Seventh Circuit that YRC was Downey's indirect or *de facto* employer.  Summary judgment on this basis is therefore inappropriate.

YRC has also moved to strike portions of Downey's statement of additional facts and affidavit in support of those facts.  YRC contends that these materials contain evidence that is inadmissible because it is conclusory, speculative, and relies on inadmissible hearsay.  Because the Court has not relied on the challenged portions of Downey's statement of additional facts or his affidavit in denying YRC's motion, the Court denies as moot YRC's request to strike.

**Conclusion**

For the reasons stated above, the Court denies YRC's motion for summary judgment, insofar as it argues that YRC cannot be considered Downey's employer for purposes of liability under 42 U.S.C. § 1981 [docket no. 74], and denies as moot YRC's

motion to strike [docket no. 96]. The case is set for a status hearing on September 24, 2012, at 9:30 a.m. to set a briefing schedule on the remainder of YRC's summary judgment motion.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: September 18, 2012