IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| WILLIE C. DOWNEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 09 C 5870 |
| | ) | |
| RALPH BRISCOE, R.W. BRISCOE & | ) | |
| ASSOCIATES, INC. , ENFORCEMENT | ) | |
| SECURITY AGENCY and YRC, INC. f/k/a | ) | |
| ROADWAY EXPRESS, INC. | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Pursuant to 42 U.S.C. § 1981, Willie C. Downey has sued YRC Inc., a commercial freight handling company at whose facility Downey worked; R.W. Briscoe & employed Downey; and Ralph Briscoe, ESA's president. Downey alleges in his amended complaint that the defendants, including YRC, subjected him to a racially hostile work environment.

YRC moved for summary judgment on the grounds that it was not Downey's actual or *de facto* employer and on several other grounds. The Court decided to address the *de facto* employer issue first, deferring the remainder of YRC's motion. On September 18, 2012, the Court denied YRC's motion for summary judgment on that point. *See Downey v. R.W. Briscoe & Assoc. Inc.*, No. 09 C 5870, 2012 WL 4176853 (N.D. Ill. Sept. 18, 2012). The Court then permitted Downey to conduct additional discovery relevant to the remaining issues.

The Court now addresses the remainder of YRC's summary judgment motion and denies it for the reasons stated below.

**Background**

YRC operates a trucking and freight terminal facility in Chicago Heights, Illinois. Downey, who during relevant periods was an employee of ESA, worked as a security guard at this terminal from 1998 to 2008. His duties involved screening incoming and outgoing employees, inspecting trucks before they left the facility, and recording the identification details of each truck and employee in a shift log. Until 2006, Downey was also responsible for patrolling the premises, which included the loading docks, bathrooms, buildings, and fence line. After 2006, Downey no longer had this duty and was instead expected to maintain watch mostly at the facility's exit gates. Downey says that he and the other security guards still made facility-wide inspections one or two times a week.

**A. Evidence of racial harassment**

Downey has offered evidence of at least four different forms of racial harassment. First, he stated during his deposition that African-American workers at the facility found nooses in conspicuous areas throughout the ten years that he worked there. On one occasion, an African-American forklift driver found a noose hanging from his forklift. On another occasion, a white supervisor received complaints about a noose, confiscated it, and displayed it on his desk.

Downey further testified that graffiti, namely racial slurs and death threats, continuously covered the walls of YRC bathrooms throughout the decade that he was there. Downey recalled, for example, that "KKK" was written in the "northeast bathroom

2

on the northbound dock" of the facility. Pl. Ex. 1 at 104.

Downey also testified that YRC employees displayed racist tattoos and symbols throughout his career at the YRC facility. At least some of these employees were truck drivers and dock workers who exhibited Confederate license plates and flags on their cars. Downey specified that he last saw such symbols at YRC during his final week there.

Downey further stated during his deposition that YRC employees referred to him as a "nigger" and in other racist terms at least twice a week over the course of his employment at YRC. Pl. Ex. 1 at 122-23.

In addition to his own deposition, Downey provided the depositions of African-American employees on whose behalf the EEOC sued YRC for a hostile working environment in 2010. Like Downey, these employees testified about the prevalence of nooses and racist graffiti on YRC premises.

Downey offered evidence in his second affidavit that he did not offer in his deposition, namely that YRC forklift drivers tried to hit him on account of his race, one of the bathrooms contained a racist message scrawled in excrement in 2005, and he himself once saw a noose wrapped around a fire extinguisher.

**B.     Reporting of racial harassment**

Downey was required to log possible security breaches and other problems. He was also required to submit that documentation to his supervisors at ESA and predecessor entities that employed him—Captain Philip Wise before June 2006 and Captain Albert Wells for the remainder of the time he worked at the YRC facility. Downey says he recorded the display of nooses, existence of graffiti, and occurrence of

3

verbal racial slurs. At the end of each shift, he submitted the documentation to his supervisor. Both supervisors indicated that they would pass along the documentation to YRC. Although Downey testified that he could not confirm whether YRC had actually ever received his documentation, he stated that he would observe his supervisors taking his logs into YRC's offices.

Downey also testified that he discussed racial harassment at the facility with Harvey Leach and Frank Wsol, who were union stewards as well as YRC employees. Leach and Wsol each told Downey that they would not address his complaints because he did not belong to the unions that they represented.

## Discussion

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012) (internal quotation marks omitted). In other words, summary judgment is appropriate when no reasonable juror could return a verdict in favor of the non-movant based on the evidence that the parties have provided. *See Ball v. Kotter*, 723 F.3d 813, 821 (7th Cir. 2013). In considering a motion for summary judgment, the Court must consider the facts in the light most favorable to the non-movant and draw reasonable inferences in his favor. *See Antonetti v. Abbott Labs.*, 563 F.3d 587, 591 (7th Cir. 2009).

To prove a hostile work environment claim against an employer under section 1981, the employee must demonstrate that: 1) the work environment was both

subjectively and objectively offensive, 2) the employee's race was the cause of the harassment, 3) the conduct was severe or pervasive, and 4) there is a basis for employer liability. *Montgomery v. American Airlines*, 626 F.3d 382, 390 (7th Cir. 2010).

In seeking summary judgment, YRC argues that Downey has not offered admissible evidence from which a reasonable jury could find that he was subjected to a work environment that was both subjectively and objectively offensive and that there is no basis for employer liability.

**A.  Evidence of a subjectively and objectively offensive work environment**

**1.  Consideration of events more than four years prior to suit**

Among other things, YRC argues that a majority of the conduct that Downey alleges should not be considered because it occurred outside the applicable four-year limitation period that governs section 1981 claims, in other words, before September 21, 2005.

"[C]onsideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period." *Turner v. Saloon, Ltd.*, 595 F.3d 679, 684 (7th Cir. 2010). Downey's evidence spans the ten-year period that he worked on YRC premises, including the time within the limitation period. Thus the earlier conduct is appropriately considered in assessing Downey's claim.

YRC argues that a plaintiff in a hostile work environment case who argues that pre-limitations conduct should be considered must show that the same managers were responsible for the pre-period and post-period acts. But the Supreme Court case that

5

serves as the only authority that YRC cites in support of its contention, *see Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002) (cited in Def.'s Reply at 14-15), establishes no such requirement; rather, it simply noted that the court of appeals had found that was so in the case under review. *See id.* at 120. The standard established in *Morgan* is "whether the acts about which an employee complains are part of the same actionable hostile work environment practice, and if so, whether any act falls within the statutory time period." *Id.* A reasonable fact finder could determine that both of these propositions are true in this case.

For these reasons, it is appropriate to consider events that occurred before September 21, 2005 for the purpose of assessing whether a reasonable jury could find YRC liable.

### 2. Consideration of Downey's second affidavit

YRC has also asked the Court to disregard certain contentions in Downey's second affidavit, submitted with his response to YRC's summary judgment motion. YRC contends that the affidavit contains statements by Downey that contradict his deposition testimony, specifically statements that YRC forklift drivers tried to hit him on account of his race, he came across a racist message scrawled in excrement in 2005, and he once found a noose wrapped around a fire extinguisher.

YRC relies on law in this circuit to the effect that

> a party may not attempt to survive a motion for summary judgment by manufacturing a factual dispute through the submission of an affidavit that contradicts prior deposition testimony. Consequently, where a deposition and affidavit are in conflict, the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken perhaps because the question was phrased in a confusing manner or because a lapse of memory is in the circumstances a plausible explanation for the discrepancy.

6

*Amadio v. Ford Motor Co.*, 238 F.3d 919, 926 (7th Cir. 2001). In *Amadio*, the court concluded that plaintiff's affidavit contradicted his prior deposition because he provided opposing responses to the same question, declined to address an issue during his deposition only to discuss it in his affidavit, and answered "no" when asked during his deposition if "just for the sake of completeness" he remembered anything other than what he had just testified to. *Id.*

It appears to be the case that the statements in Downey's affidavit that YRC challenges were not part of his deposition testimony. But that does not mean those statements *contradict* his deposition testimony. YRC has not offered anything to indicate Downey has provided opposing responses to the same question; that he was asked during his deposition to recount his own experience with YRC forklift drivers, graffiti, or nooses; or that the deposition questions and answers reflect that he gave what he represented to be a complete account of the racial harassment at YRC. In fact, Downey's deposition was largely limited to questions about the allegations in his first amended complaint, which did not include the disputed matters in his second affidavit. The following question is representative of Downey's exchange with YRC's counsel: "And then in the same paragraph . . . about the middle of that line, it says 'Death threats directed at African-Americans were written in the bathrooms.' . . . Can you tell me approximately when are these incidents that you're referring to?" Pl. Ex. 1 at 100. On the present record, there is no basis for a determination that Downey has contradicted his deposition testimony.

For these reasons, the Court rejects YRC's contention that Downey's second affidavit is not appropriately considered in assessing whether he has offered evidence

sufficient to defeat YRC's motion for summary judgment.

### 3. Specificity of evidence

YRC argues that Downey's evidence is too vague for a reasonable juror to find the existence of a hostile work environment. YRC stresses that Downey does not identify by name any YRC employees who participated in racial harassment at the Chicago Heights facility.

YRC cites no case, however, holding that to sustain a hostile work environment claim, an employee must be able to identify the perpetrators by name. Though the lack of particulars might affect a jury's view of the believability of Downey's testimony or the weight to be given to it, this factor does not inexorably lead to a conclusion that Downey cannot prevail. Rather, the appropriate focus is on what a reasonable jury could find the admissible evidence shows regarding the totality of the circumstances making up the allegedly hostile work environment. "Factors that may be considered in deciding whether the environment is hostile or abusive 'may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Mendenhall v. Mueller Streamline Co.,* 419 F.3d 686, 691 (7th Cir. 2005) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

The Seventh Circuit regards the usage of racial epithets as particularly persuasive evidence of a hostile work environment. "While there is no magic number of slurs that indicate a hostile work environment, we have recognized before that an unambiguously racial epithet falls on the more severe end of the spectrum." *Cerros v. Steel Techs., Inc.*, 398 F.3d 944, 950 (7th Cir. 2005) (internal quotation marks omitted).

In one case, for example, the Seventh Circuit concluded that summary judgment against an employee was inappropriate where there was evidence that the employee's co-workers called her a "black bitch" and "nigger" several times over the course of three months. *Chaney v. Plainfield Healthcare Ctr.*, 612 F.3d 908, 912 (7th Cir. 2010).

Downey has offered evidence via affidavit and deposition testimony that, throughout his ten years working at a YRC facility, nooses were displayed in conspicuous areas; graffiti consisting of racial slurs and death threats covered the bathroom walls at the workplace; YRC employees displayed racist tattoos and symbols, including Confederate license plates and flags; and YRC employees referred to him as a "nigger" and in other racist terms at least twice a week. A jury might or might not believe Downey, but that is not the issue on summary judgment. There is no question that a reasonable jury that believed Downey's testimony could find the conditions and events that he cites amounted to severe and pervasive conduct based on his race that was offensive to him and would be offensive to any reasonable employee in his situation. In particular, the display of nooses and some of the alleged graffiti are considered particularly severe, because they imply a physical threat. "The noose in this context is a symbol not just of racial discrimination or of disapproval, but of terror." *Porter v. Erie Foods Int'l, Inc.*, 576 F.3d 629, 635 (7th Cir. 2009) (internal quotation marks omitted). *See Cerros*, 398 F.3d at 950-51.

YRC contends that Confederate emblems do not alone indicate a hostile work environment. The short answer is that this is not the only evidence that Downey cites. In any event, the Seventh Circuit has recognized that "displays of confederate flags in the workplace may support a hostile work environment claim." *Ellis v. CCA of Tenn.*

9

*LLC*, 650 F.3d 640, 648 (7th Cir. 2011).

The Court concludes that Downey's evidence of racial harassment at the YRC facility would permit a reasonable juror to find that he was subjected to an actionable hostile work environment.[1]

**B.     Employer liability**

YRC also seeks summary judgment on the ground that there is no basis for employer liability. An employer may be held liable for a hostile work environment based on the conduct of the plaintiff's supervisors or, in some circumstances, the plaintiff's co-workers. When, as in this case, the allegedly hostile work environment is claimed to have been created by the plaintiff's co-workers, the employer is liable only if it was negligent in discovering or remedying the conduct. *Rhodes v. Ill. Dep't. of Transp.*, 359 F.3d 498, 505-06 (7th Cir. 2004). YRC argues in particular that Downey cannot show that the company had either constructive or actual notice of the alleged conduct and conditions.

   **1.     Awareness of racial harassment**

An employer is not liable for a hostile environment caused by non-supervisory personnel unless it failed to take appropriate remedial measures "once apprised of the

---

[1] Because Downey's evidence of racially hostile conditions that were directed at him or that he observed are sufficient to permit a reasonable jury to find in his favor, the Court does not consider for this purpose his evidence of hostile conditions experienced by others of which he was unaware. Such evidence is almost certainly irrelevant to show whether *Downey's* work environment was racially hostile. *See, e.g., Mason v. S. Ill. Univ. at Carbondale*, 233 F.3d 1036, 1046 (7th Cir. 2000) ("[F]or alleged incidents of racism to be relevant to showing the severity or pervasiveness of the plaintiff's hostile work environment, the plaintiff must know of them."). This does not mean, however, that the evidence is inadmissible for other purposes, such as to show a pattern of activity to the extent YRC disputes Downey's own experiences, notice to YRC, or the adequacy of YRC's response to racially hostile conduct at the workplace.

harassment." *Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 478 (7th Cir. 2004) (internal quotation marks and emphasis omitted). Generally, an employer is not considered to have been apprised of harassment "unless the employee makes a concerted effort to inform the employer that a problem exists." *Rhodes*, 359 F.3d at 506. But an employer is considered to have constructive notice of a hostile work environment "where the harassment was sufficiently obvious." *Id.; see Mason*, 233 F.3d at 1046 n.8.

A jury reasonably could find, based on Downey's testimony, that he did what was necessary to bring to YRC's attention the racially harassing activity of which he was aware. Specifically, Downey has offered testimony that he was told that the only procedure for him to bring misconduct to YRC's attention was via his daily logs; he provided his logs, which contained reports of racially hostile activity, to his own supervisors; those supervisors assured him they would bring this to YRC's attention; and he observed them taking his logs into YRC's offices. A jury reasonably could infer from this that YRC was apprised of the problem directly from Downey.

Even were that not the case, Downey has offered evidence sufficient to permit a finding of constructive notice. YRC argues that it could not have had constructive notice of the racial harassment because the Chicago Heights facility is very large, with hundreds or even thousands of people and vehicles passing through it every day. Downey has offered evidence, however, of a racially hostile work environment that was open and obvious. A reasonable jury could find that frequent or ongoing racial harassment that took place in common areas was sufficient to give rise to constructive notice regardless of how big or busy the facility was.

11

YRC argues that Downey has not offered sufficient evidence of open and obvious harassment of *him*, leaving YRC unaware that he was in need of remedial efforts. YRC also points to Downey's failure to identify even one perpetrator, arguing that this confirms that any harassment was insufficiently open or pervasive for YRC to be on notice of its existence, absent evidence that any employee reported the particular conduct or conditions.

YRC's argument about the impact of Downey's inability to name names disregards settled law regarding how a court considering a summary judgment motion considers testimony and draws inferences. "On summary judgment, a court may not weigh the evidence or decide which inferences should be drawn from the facts." *Costello v. Grundon*, 651 F.3d 614, 636 (7th Cir. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). "Rather, the court's task is to determine based on the record whether there is a genuine issue of material fact requiring trial." *Id.* In doing so, a Court is required to draw reasonable inferences in favor of the non-moving party—in this case, Downey—not the other way around. *See, e.g., Johnson v. General Bd. of Pension & Health Benefits of United Methodist Church*, 733 F.3d 722, 727 (7th Cir. 2013). Thus although Downey's apparent inability to identify perpetrators might lead a jury to disbelieve him, it is not an appropriate basis for the Court to discount his testimony when assessing whether summary judgment is warranted. In any event, a good deal of the hostile and harassing behavior that Downey cites consisted of writing graffiti, hanging nooses, and other conduct that almost by definition would have been done surreptitiously, or at least when those whom the bigoted employees were targeting were not watching. And given Downey's role a security guard employed directly by an

outside contractor, it is hardly surprising that he might not know or remember the names of YRC workers who voiced racial epithets. YRC can certainly argue to a jury that Downey's account is not credible due to the absence of such particulars, but a reasonable jury could believe his testimony.

The Court also rejects YRC's argument that there is insufficient evidence to give rise to constructive notice that Downey himself had been targeted. First of all, it is unclear that sort of focused evidence is necessary in a case of this sort. Downey claims to have been victimized by the same conduct, or at least the same sort of conduct, that was directed generally at African-American workers at the facility. A reasonable jury could find that the pervasiveness of activity that by its very nature targeted all workers of a particular racial group at YRC's facility was sufficient to establish constructive notice to YRC as to claims by particular workers. In any event, the incidents that Downey says that he himself experienced are of a nature and frequency that a reasonable jury could find YRC was on constructive notice of those particular conditions. Downey has testified or stated in his affidavit that throughout the period when he worked at the facility, nooses were displayed in conspicuous areas, racist graffiti covered the walls of all of the bathrooms, racist tattoos and symbols were exhibited in an area of great activity, and he himself was called a "nigger" throughout the premises at least twice a week. A reasonable jury could find this sufficient to give rise to constructive notice on the part of YRC.

    **2.    Remedial action**

YRC contends that Downey cannot prove it was negligent in dealing with complaints about racial harassment and hostility. It argues that it conducted extensive

monitoring of the workplace, investigated and responded to complaints of discrimination and harassment when it was made aware of them, offered official mechanisms for lodging complaints, and never discouraged workers from making complaints.  There is evidence, however, that the allegedly pervasive racially hostile conditions at the Chicago Heights facility persisted until the EEOC took action.  A reasonable jury could find, based on this alone, that YRC's efforts fell short of being "reasonably calculated to prevent further harassment under the particular facts and circumstances of the case at the time the allegations [were] made." *Jackson v. Cty. of Racine*, 474 F.3d 493, 502 (7th Cir. 2007).  As Downey argues, a reasonable finding could be made that YRC's efforts were sufficiently inadequate that they effectively signaled permission for the perpetrators of the racist activity to continue acting as they did.  As the Supreme Court recently reaffirmed, "an employer will always be liable when its negligence leads to the creation or continuation of a hostile work environment." *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2452 (2013).

## Conclusion

For the foregoing reasons, the Court denies YRC's motion for summary judgment [docket no. 74].  The case is set for a status hearing on December 5, 2013 at 9:30 a.m. for the purpose of setting a trial date and discussing the possibility of settlement.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  November 29, 2013

14